UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TARA D. TYREE, ) | |
|     Plaintiff, ) | |
| ) | Case No. 3:09-cv-1091 |
| v. ) | Judge Nixon/Brown |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security, ) | |
|     Defendant. ) | |

To:   The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Response. (Docket Entries 13, 15). Plaintiff has also filed a Reply. (Docket Entry 16). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 11). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and the decision of the Social Security Administration be **AFFIRMED**.

## I. INTRODUCTION

Plaintiff filed an application for SSI and DIB on June 20, 2006, alleging a disability onset date of June 1, 2006. (Tr. 111-14). Plaintiff claims she is disabled due to back and leg problems. (Tr. 116). Plaintiff's claim was denied initially and on reconsideration. (Tr. 56-59,

1

63-66). Plaintiff filed a request for a hearing with an Administrative Law Judge ("ALJ") on February 21, 2007. (Tr. 67). A hearing was conducted before ALJ Barbara Kimmelman on September 10, 2008. (Tr. 77). A vocational expert ("VE"), Gail Ditmore, testified at the hearing. (Tr. 26-32). The ALJ denied Plaintiff's claim on December 30, 2008. (Tr. 43-50).

In her decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 3, 2011.

2. The claimant has not engaged in substantial gainful activity since June 1, 2006, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc disease; migraine headaches (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk 2 hours and sit 6 hours in an 8 hour workday, only occasionally reach above the shoulder, and must have the option to change positions every 30 minutes.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 29, 1973 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

2

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The Appeals Council denied Plaintiff's request for review on September 22, 2009. (Tr. 35-37). This action was timely filed on November 12, 2009. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff was born on August 29, 1973 and was 33 years old on her alleged onset date. (Tr. 7). She would be classified as a "younger person" under the disability regulations. 20 CFR §§ 404.1563, 416.963. Plaintiff obtained her GED certificate in February 2005 and a certificate in water treatment restoration five months later. (Tr. 8, 121).

Plaintiff last worked as a certified cleaning technician for R. Warren Construction, a fire restoration construction company, from April 2005 to May 2006. (Tr. 117, 127). As a cleaning technician, Plaintiff stated she took inventory, boxed and packed items, loaded furniture, drove, prepared time sheets for coworkers, and cleaned structures and contents. (Tr. 128). She also frequently lifted 50 pounds or more. (Tr. 128). Plaintiff stated she was fired due to poor work performance as a result of her back pain. (Tr. 7, 116).

Plaintiff previously worked as a cashier and cook at a truck stop, from 2000 until 2004. (Tr. 117). Plaintiff was required to stand or walk most of the day, and she occasionally lifted 20 pounds and frequently lifted less than 10 pounds. (Tr. 129). Plaintiff worked as a cook at a nursing home from 1997 to 2001, where she stood or walked most of the day and frequently

lifted 25 pounds. (Tr. 130). Plaintiff has also been employed as a restaurant cashier and factory worker. (Tr. 132-33). Both jobs required standing or walking most of the day.

On May 25, 2006, Plaintiff was treated at the Hope Clinic for hip pain and was diagnosed with sciatica. (Tr. 160). On June 7, 2006, she returned to the Hope Clinic and was treated for side radiculopathy. (Tr. 159). Plaintiff denied back pain or injury. (Tr. 159). Plaintiff then underwent an MRI of the lumbar spine on June 9, 2006 at Middle Tennessee Medical Center, which showed a large left paracentral posterior protruding disc at the L5-S1 level with associated mass-effect and degenerative disc changes, as well as mild posterior bulging disc at L3-L4 and L4-L5 with desiccation. (Tr. 177-78). This result is similar to the conclusion reached in a March 15, 2002 MRI of Plaintiff's lumbar spine. (Tr. 179).

Plaintiff completed a Pain Questionnaire on July 11, 2006. (Tr. 123-26). She stated her pain began in March or April of 2006 and had become increasingly severe. (Tr. 123). Shestated that she cannot drive because her pain medication makes her drowsy. (Tr. 123). She noted that her daily activities, including caring for her seven children, were interrupted due to the pain. (Tr. 126).

Plaintiff was referred to Dr. Philip Rosenthal by Debbie Boles, ANP. (Tr. 210). Dr. Rosenthal found Plaintiff was positive for a left lumbar radiculopathy, based on his examination and the June 9 MRI results. (Tr. 210). Dr. Rosenthal recommended surgery. (Tr. 210). On August 21, 2006, Dr. Rosenthal performed a microlumbar diskectomy of Plaintiff's L5-S1 herniated nucleus pulposus. (Tr. 201-02). Plaintiff saw Dr. Rosenthal for a follow-up visit on August 31, 2006. (Tr. 209). He noted Plaintiff showed some signs of improvement of her radiculopathy and recommended Plaintiff reduce her physical activities. (Tr. 209). Plaintiff next

4

visited Dr. Rosenthal on October 17, 2006. (Tr. 208). Plaintiff reported that she did have pain but not as severe and only occasionally. (Tr. 208). Dr. Rosenthal noted her preoperative symptoms were improving, and he advised Plaintiff to follow detailed exercises to strengthen and tone her lumbar paraspinous muscles and ligaments. (Tr. 208).

Dr. James B. Millis issued a Residual Functional Capacity ("RFC") Assessment, based on his review of Plaintiff's medical records, on November 1, 2006. (Tr. 211-18). Dr. Millis concluded Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for approximately 6 hours in an 8 hour day, and sit about 6 hours in an 8 hour day. (Tr. 212). He noted Plaintiff's alleged impairments were credible. (Tr. 216). Dr. Millis noted Plaintiff would be expected to show continued improvement on or before August 2007, leading to his conclusions. (Tr. 218.

Plaintiff then sought treatment at Smyrna Medical Group. (Tr. 220). Plaintiff complained of neck and back pain on November 9 and 27, 2006. (Tr. 220-21). Plaintiff had an MRI on November 14, 2006, which showed very minimal concentric disc bulging at C4-C5 and C5-C6. (Tr. 224). The MRI was otherwise normal. (Tr. 224).

Plaintiff was treated by Dr. William Schooley, a neurosurgeon, on December 1, 2006. (Tr. 232-39). Dr. Schooley noted Plaintiff's pain had gotten worse recently, with pain in her neck and tingling down both arms. (Tr. 232). Plaintiff was taking ibuprofen and tramadol for pain. (Tr. 232). Dr. Schooley diagnosed Plaintiff with lumbar spondylosis and cervical spondylosis. (Tr. 232). He also believed she had paraspinous spasms, as well. (Tr. 232). Dr. Schooley recommended cervical traction three times a day for 10 minutes at a time and prescribed Flexeril and Lortab. (Tr. 233).

5

Plaintiff saw Dr. Schooley at a follow-up visit on January 12, 2007. (Tr. 301). Plaintiff complained of worsened leg pain over the past couple of months, and Dr. Schooley recommended a new MRI of her lumbar spine. (Tr. 301). He refilled her pain medication, changing to Soma from Flexeril because Flexeril was making her too groggy. (Tr. 301). Following this visit, Plaintiff had an MRI of the lumbar spine on February 27, 2007. (Tr. 311-12). The MRI showed degenerative changes of L3/4, L4/5, and L5/S1, primarily dessication. (Tr. 311). There was a mild bilateral neural foraminal stenosis at L5/S1, with a minimal amount of epidural fibrosis surrounding the left S1 nerve. (Tr. 311). There was also a disc bulge with central/paracentral disc protrusion at L4/5, and the left L5 nerve was displaced posterolaterally toward the left and was probably compressed. (Tr. 311). Finally, there was a central disc protrusion on a broad-based diffuse disc bulge at L3/4, which extended into the anterior epidural space abutting the ventral aspect of the thecal sac without stenosis. (Tr. 311).

On February 4, 2007, Dr. Christopher W. Fletcher issued a Residual Functional Capacity assessment based on his review of Plaintiff's medical records. (Tr. 240-47). Dr. Fletcher concluded Plaintiff could occasionally lift 50 pounds, could frequently lift 25 pounds, could stand or walk about 6 hours in an 8 hour day, and could sit for about 6 hours in an 8 hour day. (Tr. 241). He noted Plaintiff's allegation of pain is credible, based on her medical records. (Tr. 247). He stated that, "[a]llowing additional for continued healing and strengthening, the RFC is projected, as noted to 8/21/07." (Tr. 247).

On Dr. Schooley's referral, Plaintiff saw Dr. Cyrus Erickson at The Pain Management

6

Group on March 15, 2007.[1]  (Tr. 291-99).  Plaintiff stated her back and leg pain was caused by heavy lifting in her employment, and she stated none of the medications she has used has taken away all her pain.  (Tr. 291).  Dr. Erickson administered a lumbar epidural steroid injection for Plaintiff's back pain.  (Tr. 294).  The nurse noted Plaintiff's pain was 4 of 10 prior to the procedure.  (Tr. 299).

Dr. Schooley examined Plaintiff again on April 6, 2007.  (Tr. 302).  He noted the cervical traction had not been helpful, though she had noticed some improvement from the epidural steroid injections in her lumbar spine.  (Tr. 302).  Dr. Schooley recommended physical therapy for Plaintiff's neck, and he refilled Plaintiff's Lortab and Soma prescriptions.  (Tr. 302).

On June 1, 2007, Plaintiff saw Dr. Schooley for a follow-up visit.  (Tr. 303).  He noted that, despite Plaintiff complaining of worsened neck pain, "[h]er MRI did not show anything but some degenerative disc disease.  It was not very severe at all."  (Tr. 303).  Dr. Schooley also noted that physical therapy had not helped.  (Tr. 303).  Dr. Schooley recommended a myelogram CT of Plaintiff's neck, as well as an EMG of Plaintiff's arms, because she had some "odd feeling in her arms."  (Tr. 303).

Plaintiff had a CT of her cervical spine on June 26, 2007, which showed minimal C5-C6 disk bulge scoliosis with upper cervical straightening.  (Tr. 313).  On June 29, 2007, she again saw Dr. Schooley, who noted Plaintiff's EMG was normal.  (Tr. 304).  He stated, "She has some spondylitic disease on her recent studies, but it is not terribly severe."  (Tr. 304).  Dr. Schooley "did not see any nerve root impingement.  There is certainly nothing on the right side.  There is

---

[1] Plaintiff may have first seen Dr. Erickson on March 8, 2007, but the date of the examination is unclear on the photocopied record.  (Tr. 291).

some foraminal stenosis on the left side in her neck." (Tr. 304). Dr. Schooley encouraged Plaintiff to keep doing her traction, because the physical therapy made her worse, and he did not believe she had "anything severe enough to operate on." (Tr. 304). He also prescribed Motrin, Lortab, and Flexeril. (Tr. 304).

Dr. Schooley examined Plaintiff again on August 24, 2007. (Tr. 305). He noted that Plaintiff's neck pain was sharper as of the previous day, and that the pain went down her arm and had moved to the left side. (Tr. 305). He noted Plaintiff did not wish to have anything done at that time, so he would not do a discogram. (Tr. 305). He scheduled her for an MRI of the cervical spine and gave her a prescription for Motrin, Lortab, and Flexeril. (Tr. 305).

Plaintiff had an MRI of her cervical spine on September 21, 2007. (Tr. 307-08). The MRI showed reversal normal lordotic curvature probably related to positioning and minimal degenerative changes mid cervical spine with a small right paracetnral disc bulge/herniation C4-C5 level effacing the anterior aspect of the thecal sac without significant canal or neural foraminal compromise. (Tr. 308). She saw Dr. Schooley on the same day. (Tr. 306). He noted Plaintiff's degenerative disc disease in her neck was "not very severe" and that "[s]he does not have any disc bulging that could cause any significant impingement on the cord." (Tr. 306). Though there was "some impingement on the thecal sac, . . . there is a large amount of spinal fluid surrounding her nerves and her cord." (Tr. 306). He noted Plaintiff did not wish to have surgery at the time. (Tr. 306). He suggested she be referred to pain management for further pain treatment. (Tr. 306). While stating he would schedule a follow-up visit in two months, there is no evidence of that visit in the record. (Tr. 306).

8

Plaintiff returned to The Pain Management Group on October 22, 2007, where she was treated by Dr. William Leone. (Tr. 284-90). Dr. Leone noted Plaintiff's pain is constant, and, at its best is 7/10 and at its worst is 10/10. (Tr. 284). He stated Plaintiff's pain was better with lying down, medication, and rest. (Tr. 284). Dr. Leone prescribed cervical epidural steroid injections. (Tr. 285). Plaintiff received injections on November 21, 2007, December 11, 2007, January 3, 2008, May 21, 2008, June 6, 2008, and June 20, 2008. (Tr. 259, 260, 261, 277, 280, 281). Plaintiff was diagnosed with probable muscle spasm on January 17, 2008, using a CT of the cervical spine, and was treated with injections on March 13, 2008 and April 10, 2008. (Tr. 250, 266, 269). The January 17, 2008 CT also showed a vacuum phenomenon in both SI joints, a mild bulging of the disc at the L3-4 level and L4-5 level, and a protrusion of the disc at the L5-S1 level. (Tr. 249). On August 4, 2008, Plaintiff stated she was holding her grandchild one day in the previous week and her back "popped," causing moderate pain. (Tr. 252).[2] At this visit, she also reported that the pain medications were causing no side effects and that she was able to do house chores as a result of taking the medication. (Tr. 251).

On September 10, 2008, Plaintiff testified before the ALJ. (Tr. 1-33). Plaintiff testified that she lives with her mother and grandmother, who help her care for her seven children, ranging in age from seven to 18. (Tr. 6, 16). Her typical day starts at 5:30, when she starts to get her children ready for school. (Tr. 17). She then lays down until about 2 p.m. (Tr. 17). Plaintiff is able to shower using a shower chair and helps her children with their homework. (Tr. 17-18). Plaintiff tries not to take her muscle relaxer in the afternoon so that she can help her

---

[2] Plaintiff testified at her hearing with the ALJ that the grandchild weighed approximately 20 pounds at the time. (Tr. 23-24).

9

children with homework. (Tr. 18). She occasionally washes the dishes or vacuums. (Tr. 19).

Plaintiff testified that she had used traction, physical therapy, and a TENS unit to try to manage her pain. (Tr. 12-13). She also tried exercises prescribed by her treating providers. (Tr. 24). Additional surgery was recommended by Dr. Schooley, but Plaintiff did not go through with it, because it is "not a good time." (Tr. 13). She testified her living situation was not conducive to a long recovery period, because she sleeps on the floor on a pallet. (Tr. 25). After she refused the surgery, Dr. Schooley stopped treating her. (Tr. 21). Plaintiff stated Dr. Schooley's office would not complete a medical source statement because Plaintiff had refused surgery. (Tr. 22).

Plaintiff testified that her employment history in the record was accurate. (Tr. 10). She testified that she did not drive to the hearing. (Tr. 8). Plaintiff smokes approximately one pack of cigarettes a day, and she has gained about 25 to 30 pounds since the end of 2006. (Tr. 7). Plaintiff testified she has constant pain in her back, at about a six or seven level out of ten when she is medicated. (Tr. 14). She also has arm pain. (Tr. 14). She testified she can lift about 10 to 15 pounds, can sit about 15 minutes at a time, and stand for about 20 minutes at a time. (Tr. 14-15).

The Vocational Expert, Gail Ditmore, testified that Plaintiff's job at the fire and water restoring company was classified as a laborer, medium, DOT code 922.687-058. (Tr. 28). The VE disagreed with the Dictionary of Occupational Titles ("DOT") assessment that this was medium work and classified it as heavy, unskilled based on Plaintiff's performance in this job. (Tr. 28). The VE testified that Plaintiff's previous positions were classified as light, unskilled (truck stop cashier), medium unskilled (nursing home cook helper), and heavy unskilled

10

(undergarment factory). (Tr. 28).

The ALJ's first hypothetical to the VE assumed a person of Plaintiff's background who could lift 50 pounds occasionally and 25 pounds frequently and could sit, stand and/or walk for 6 hours in an 8-hour workday. (Tr. 29). The VE opined that the hypothetical person could do only Plaintiff's previous job as a cashier. (Tr. 29). Next, the ALJ changed the hypothetical to assume the same individual but who was limited to lifting 20 pounds occasionally and 10 pounds frequently, who could sit for 6 hours in an 8-hour workday and stand and/or walk for 2 hours in an 8-hour workday. (Tr. 29). The VE believed none of Plaintiff's past jobs would be possible with these restrictions; she would be limited to a sedentary or sit/stand option, and the DOT does not recognize or describe sit/stand options. (Tr. 29-30). The VE testified that Plaintiff could work as an unskilled, sedentary cashier, for which there are 1,000 jobs in Tennessee and 51,000 in the U.S. economy; as an unskilled, sedentary inspection, for which there are 1,000 jobs in Tennessee and 66,000 in the U.S. economy; as an unskilled, sedentary office clerk, for which there are 1,000 jobs in Tennessee and 60,000 in the U.S. economy; or as an information clerk at the sedentary, unskilled level, for which there are 1,000 jobs in Tennessee and 48,000 in the U.S. economy. (Tr. 30).

Finally, the ALJ asked the VE to assume the same hypothetical person but with a limitation of lifting 10 pounds occasionally and 10 pounds frequently, who can sit for up to 6 hours in an 8-hour workday, could stand and/or walk for 2 hours in an 8-hour workday, could only occasionally reach about her shoulders, and who would need to change positions every 30 minutes. (Tr. 30). The VE believed the same jobs available for the previous hypothetical would be available (*i.e.*, cashier, inspector, office clerk, and information clerk). (Tr. 30-31).

11

Plaintiff's attorney asked the VE whether a hypothetical person taking pain medication with side effects who would need to rest for at least 2-4 hours in an 8-hour workday and would have frequent absences would be able to work. (Tr. 31). The VE said work would not be possible, because lying down during a workday is not allowed by any employers. (Tr. 31). Moreover, most employers allow only 10-12 working days in absences. (Tr. 31-32).

## III. CONCLUSIONS OF LAW

A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

12

B.   Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1. If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2. If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3. If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5. Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

---

[3] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423 (d)(2)(B).

C.     Plaintiff's Statement of Error

Plaintiff identifies two errors for review: first, that the Residual Functional Capacity ("RFC") conclusion reached by the ALJ is not supported by the weight of the evidence, and second, that the credibility of claimant's statements was not properly evaluated and assessed as required by SSR 96-7P. For the reasons set forth below, the Magistrate Judge believes neither of these arguments is persuasive.

Plaintiff first argues that the ALJ placed too much weight on the assessments given by the two non-examining state agency physicians. Plaintiff contends neither Dr. Millis nor Dr. Fletcher had reviewed the entire record, since Plaintiff received significant treatment after their assessments were made. Moreover, Dr. Fletcher's RFC is projected for a later date based on Plaintiff's expected continued recovery. Plaintiff believes the ALJ affording great weight to these reports is error.

The Magistrate Judge believes that, ultimately, the Plaintiff failed to provide sufficient evidence of her alleged RFC. As noted above, it is the Plaintiff's burden to prove her alleged RFC. Plaintiff has failed to obtain an RFC from one of her treating providers, and the medical record does not contradict the RFC assesments completed by Dr. Millis and Dr. Fletcher. In 2007, Dr. Schooley noted Plaintiff's degenerative disc disease was "not very severe at all." (Tr. 303). The MRIs taken of Plaintiff's spine support this finding and indicate that, while Plaintiff

14

does have some degenerative disc disease, it is slight. (Tr. 307-08).

The Magistrate Judge is troubled that Dr. Fletcher's RFC is prospective in nature. (Tr. 240-47). There seems to be no real utility in estimating what an applicant's RFC *might* be at some point in the future. Dr. Fletcher's RFC is, however, consistent with Dr. Millis's assessment from November 1, 2006. (Tr. 211-18). While it would be far preferable to have an RFC assessment prepared by someone who had actually examined Plaintiff, in its absence, the ALJ's reliance on these reports is understandable. Based on Plaintiff's testimony in light of her medical records, the ALJ reduced Plaintiff's RFC. The Magistrate Judge believes, without an RFC assessment submitted by one of Plaintiff's treating providers, the ALJ had substantial evidence for relying on RFC assessments prepared by non-examining consultants in formulating the RFC.[4]

Plaintiff also alleges the ALJ did not properly evaluate her credibility. Plaintiff takes issue with the following language from the ALJ's opinion: "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Plaintiff believes this is an illogical statement, because the ALJ cannot believe the impairments produce the alleged symptoms while at the same time believing Plaintiff is not entirely credible in describing her symptoms. Plaintiff also argues that the ALJ did not specifically state whether she found the claimant's testimony credible or the amount of weight she assigned to Plaintiff's testimony.

---

[4] The Magistrate Judge also notes that Plaintiff is insured until December 3, 2011 and can therefore refile for benefits using new evidence.

An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Further, discounting the credibility of a claimant is appropriate where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id*. In addition, in assessing the credibility of an individual's statements about symptoms, the ALJ must consider:

> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-70, 1996 WL 374186.

While the ALJ believed Plaintiff suffered from pain due to her impairments, the ALJ doubted the alleged severity of Plaintiff's pain. The ALJ assessed Plaintiff's claims of pain in light of her daily activity level, her medical records, and her refusal to have further surgery at this time. The ALJ noted that Plaintiff reported being able to vacuum once a week and that she did

16

not take pain medication during the day in order to be able to help her children with homework. (Tr. 47). In addition, the ALJ relied on the fact Plaintiff had told Dr. Leone in August 2008 that "she had no medication side effects, pain medication allowed her to perform household chores, but she had developed moderate pain after holding a grandchild." (Tr. 48). Plaintiff's refusal to have additional surgery recommended by her physician adds to the substantial evidence the ALJ relied on to doubt Plaintiff's credibility regarding the severity of her symptoms. (Tr. 47). Particularly giving the ALJ the deference she is due in matters affecting the determination of credibility, and in the absence of legal error, the undersigned must conclude that the forgiving substantial evidence standard is met here.

The Magistrate Judge believes the ALJ had substantial evidence to doubt Plaintiff's credibility regarding the severity of her pain. In addition, Plaintiff failed to submit sufficient evidence regarding her RFC, and the ALJ properly relied on the RFC assessments made by non-examining consulting physicians. The ALJ's denial of benefits is supported by substantial evidence.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and the decision of the Social Security Administration be **AFFIRMED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this

17

Case 3:09-cv-01091  Document 17  Filed 04/20/10  Page 17 of 18 PageID #: 81

Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

      ENTERED this 20th day of April, 2010.

                                    /S/ Joe B. Brown
                                    JOE B. BROWN
                                    United States Magistrate Judge